UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

IN THE MATTER OF THE ) No. 09-70576 DMR
EXTRADITION OF EUSTOLIO )
GONZALES GONZALES, )
) EXTRADITION ORDER
)
)

In these proceedings, the government of Mexico seeks the extradition of Eustolio Gonzales Gonzales, an eighty-two year old legal permanent resident of the United States. Mexican authorities have charged him with the attempted homicide of two individuals in an incident that allegedly took place on March 6, 2006 in Ziracuaretiro in the State of Michoacan.

The court conducted extradition hearings on February 2 and 27, 2012. Pursuant to 18 U.S.C. § 3184, for the reasons stated below, the court certifies to the United States Secretary of State that there is sufficient evidence to sustain the charge against Mr. Gonzales Gonzales under the governing extradition treaty.

**I. PROCEDURAL BACKGROUND**

On June 26, 2009, the United States filed a complaint for provisional arrest upon request

ORDER RE EXTRADITION
09-70576 DMR 1

of the Mexican government, and pursuant to the extradition treaty in force between the two countries, Proclamation on Extradition, U.S.-Mex., Jan. 25, 1980, 31 U.S.T. 5059 ("Treaty"). [Docket No. 1.] Mr. Gonzales Gonzales made his initial appearance on September 4, 2009. [Docket No. 3.] On September 15, 2009, the court released him from custody subject to a $250,000 bond and other release conditions, including location monitoring. [Docket No. 13.][1]

Mr. Gonzales Gonzales subsequently filed a motion arguing that the complaint for provisional arrest should be dismissed under Article 7 of the Treaty because the lapse of time between the underlying charged conduct, which occurred in 2006, and the filing of the 2009 extradition complaint violated the Speedy Trial Clause of the Sixth Amendment. [Docket No. 19.] The Honorable Saundra B. Armstrong denied the motion on October 31, 2011[2] [Docket No. 38], and reassigned the matter to this court to conduct the extradition proceedings.

## II. LEGAL STANDARDS

Extradition is a diplomatic process initiated by a request from the nation seeking extradition directly to the United States Department of State. "After the request has been evaluated by the State Department to determine whether it is within the scope of the relevant extradition treaty, a United States Attorney ... files a complaint in federal district court seeking an arrest warrant for the person sought to be extradited." *Prasoprat v. Benov*, 421 F.3d 1009, 1012 (9th Cir. 2005) (ellipses in original) (citations and quotation marks omitted.)

Title 18 U.S.C. § 3184 governs extradition from the United States to a foreign country. If a foreign country files a sworn complaint charging an individual found within the jurisdiction, and if there is an extradition treaty or convention between the United States and the requesting

---

[1] The government has represented that it does not intend to seek Mr. Gonzales Gonzales' detention during the legal proceedings before this Court, which include this extradition matter as well as a petition for writ of habeas corpus pending before the Honorable Lucy H. Koh. *See Gonzales v. O'Keefe*, No. 12-cv-525 LHK (N.D. Cal. filed Feb. 1, 2012). Having reviewed Pretrial Services' February 23, 2012 status memorandum, as well as the record in this case, the court finds that Mr. Gonzales Gonzales should remain out of custody at this time pursuant to the current conditions governing his release.

[2] On February 1, 2012, Mr. Gonzales Gonzales filed the previously referenced petition for writ of habeas corpus to challenge the denial of his motion to dismiss.

ORDER RE EXTRADITION
09-70576 DMR 2

foreign government, the judge must hold a hearing to determine "whether (1) the crime is extraditable; and (2) there is probable cause to sustain the charge." *Cornejo-Barreto v. Seifert*, 218 F.3d 1004, 1009 (9th Cir. 2000) (footnote omitted). Upon such a finding, the judge is required to certify the same to the Secretary of State. The judicial officer "has no discretionary decision to make," for it is the executive branch, through the Secretary of State, that controls the ultimate decision regarding whether the charged individual should be surrendered to the requesting country. *Prasoprat*, 421 F.3d at 1012; *see* §§ 3184, 3186.

The judicial officer must examine the treaty in order to determine whether the charged offense is extraditable. *See Barapind v. Reno*, 225 F.3d 1100, 1105 (9th Cir. 2000). In the interest of upholding international obligations and maintaining "friendly international relationships," a treaty should be construed "more liberally than a criminal statute or the technical requirements of criminal procedure." *Factor v. Laubenheimer*, 290 U.S. 276, 298 (1933). Moreover, the court should ordinarily respect the reasonable views expressed by the Executive Branch concerning the meaning of an international treaty. *El Al Isr. Airlines, Ltd. v. Tseng*, 525 U.S. 155, 168 (1999).

Within the ambit of extradition proceedings, the probable cause standard requires the judge to determine whether there is "'evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief in the accused's guilt.'" *In re Flores Ortiz*, No. 10-MJ-2016-JMA, 2011 WL 3441618, at *7 (S.D. Cal. Feb. 9, 2011) (quoting *United States v. Wiebe*, 733 F.2d 549, 553 (8th Cir. 1984) (citing *Coleman v. Burnett*, 477 F.2d 1187, 1202 (D.C. Cir. 1973))). The judicial officer makes no determination of guilt or innocence, for "'guilt remains to be determined in the courts of the demanding country.'" *Sainez v. Venables*, 588 F.3d 713, 717 (9th Cir. 2009) (quoting *Valencia v. Limbs*, 655 F.2d 195, 198 (9th Cir. 1981)).

Evidence in support of extradition typically is presented in the form of authenticated documentary statements. *See, e.g.*, *Sainez*, 588 F.3d at 717 (certification of extradition based on sworn statements); *see also* § 3190 ("Depositions, warrants, or other papers or copies thereof offered in evidence upon the hearing of any extradition case shall be received and admitted as

ORDER RE EXTRADITION
09-70576 DMR  3

evidence" for all purposes of the hearing if "properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped"). The individual whose extradition is sought has limited evidentiary rights. He or she has no right to cross-examine witnesses, and generally may present only "evidence that explains away or completely obliterates probable cause"; "[E]vidence that merely controverts the existence of probable cause, or raises a defense, is not admissible." *Barapind v. Enomoto*, 400 F.3d 744, 749 (9th Cir. 2005) (citation and quotation marks omitted) (quoting *Mainero v. Gregg*, 164 F.3d 1199, 1207 n.7 (9th Cir.1999)). Thus, the individual facing extradition is limited to presenting "'reasonably clear-cut proof which would be of limited scope and have some reasonable chance of negating a showing of probable cause.'" *In re Flores Ortiz*, 2011 WL 3441618, at *3 (citation omitted).

In the instant case, the government presented formal extradition documents certified by Edward J. McKeon, Minister Counselor for Consular Affairs for the U.S. Embassy in Mexico City, Mexico. (Hill Decl. Attach. 1 Ex. 1 at 1, Jan. 5, 2012.) Those documents include certified English language translations of an April 7, 2006 arrest warrant charging Mr. Gonzales Gonzales with attempted homicide, as well as sworn statements of four eyewitnesses and other supporting judicial records (Hill Decl. Attach. 1 Exs. 1, 5-8). *See also* § 3190 (indicating that certificate of principal consular officer of United States shall be proof that proffered documentary evidence authenticated in manner required by tribunals of foreign country); Treaty, art. X, §§ 3, 5-6.

### III. ANALYSIS

**A. Extraditability of the Charged Offense**

Article 2 of the Treaty defines "extraditable offenses." Such offenses include wilful acts which "are punishable in accordance with the laws of both Contracting Parties by deprivation of liberty the maximum of which shall not be less than one year." Treaty, art. II, § 1. This "dual criminality" requirement allows extradition "only if the alleged criminal conduct is considered criminal under the laws of both the surrendering and requesting nations." *Clarey v. Gregg*, 138 F.3d 764, 765 (9th Cir. 1998) (citations and quotation marks omitted). However, the legal elements for establishing the crime need not be identical under the laws of both nations, as long

as the charged conduct is substantially analogous. *Id.* at 766. The Treaty also considers an attempt to commit an extraditable act as an extraditable offense. Treaty, art. II, § 4(a).

In the present case, Mr. Gonzales Gonzales has been charged with the March 6, 2006 attempted homicide of his nephews, Reynaldo Silva Vazquez and Lorenzo Silva Vaszquez, in violation of Articles 260, 11, and 55 of the Criminal Code of the State of Michoacan, Mexico. (Hill Decl. Attach. 1 Ex. 1 at 10.) This charge is substantially analogous to criminal conduct proscribed by California Penal Code sections 187 (murder) and 21a (attempt). Such a crime would be punishable by imprisonment of one year or more in both Mexico and the United States. Therefore, Mr. Gonzales Gonzales has been charged with an extraditable offense under the Treaty.

### B. Probable Cause

The Mexican government presented documentary evidence in support of extradition, including sworn statements of four eyewitnesses: Guadalupe Velasquez Perez, Maria Isabel Heredia Ramos, Lorenzo Silva Vazquez ), and Reynaldo Silva Vasquez. (Hill Decl. Attach. 1 Exs. 5-8.) These statements have been translated into English, and the grammar is somewhat difficult to decipher. The following is the court's attempt to summarize the content of each statement.

#### a.     The Statement of Reynaldo Silva Vasquez

Reynaldo Silva Vasquez ("Reynaldo") stated that he is a municipal truck driver for the city of Ziracuaretiro. According to Reynaldo, at approximately 8:30 a.m. on March 6, 2006, while driving to work, he drove past the house of his uncle, Mr. Gonzales Gonzales. Mr. Gonzales Gonzales accused Reynaldo of having damaged some cement in front of his home. Reynaldo replied that he had not done so and drove away. Reynaldo then arrived at his father's house and encountered his brother, Lorenzo Silva Vazquez ("Lorenzo"). Reynaldo asked Lorenzo to walk with him to Reynaldo's home so that Reynaldo could deliver some money to his wife. The two brothers passed in front of Mr. Gonzales Gonzales' home. Reynaldo asked Mr. Gonzales Gonzales to examine the cement to determine that he had not damaged it. Mr. Gonzales Gonzales accosted him with obscenities. He then went into his house and came out

carrying a rifle. He fired at Reynaldo several times and shot him. Mr. Gonzales Gonzales also fired at Lorenzo, then went back into his home.

### b. The Statement of Lorenzo Silva Vazquez

Lorenzo Silva Vasquez stated that he is Reynaldo's brother. They live in separate houses, but in close proximity. According to Lorenzo, at approximately 8:30 a.m. on the date in question, Lorenzo was at home when Reynaldo drove up and parked the dump truck that he drives for the city. Reynaldo told Lorenzo to walk with him to Reynaldo's house because Reynaldo was going to take money to his wife. Reynaldo told Lorenzo that Reynaldo would first stop at their cousin Cecilia's house. Lorenzo waited for Reynaldo's return. On the way to Reynaldo's house, the brothers passed in front of the home of their uncle, Mr. Gonzales Gonzales. Reynaldo told Mr. Gonzales Gonzales to come see that he had not damaged the concrete that Mr. Gonzales Gonzales had placed in the street. Mr. Gonzales Gonzales swore at Reynaldo, then went into his house and came out with a rifle. Mr. Gonzales Gonzales shot Reynaldo twice and then shot at Lorenzo, who took cover behind the corner of the house. Mr. Gonzales Gonzales then retreated into his home with the firearm. Lorenzo's statement gives a physical description of Mr. Gonzales Gonzales. It also states that approximately three months prior, Mr. Gonzales Gonzales had problems with Lorenzo's family regarding some pieces of land and that the dispute had dragged on since that time.

### c. The Statement of Guadalupe Velasquez Perez

Ms. Velasquez Perez stated that she has been married to Reynaldo for the past fifteen years, that he drives a municipal dump truck, and that her husband is Lorenzo's brother. At approximately 8:30 a.m. on the date in question, Ms. Velasquez Perez had left her home and was walking her young daughter to school. On the way, she stopped to talk with her neighbor, Isabel Heredia. Ms. Velasquez Perez saw Reynaldo and Lorenzo walking toward her. She also saw Mr. Gonzales Gonzales outside his home. She heard Reynaldo ask Mr. Gonzales Gonzales what the problem was and what he wanted, then heard Mr. Gonzales Gonzales curse at Reynaldo and ask him to wait. Mr. Gonzales Gonzales entered his home, came back out with a rifle, and started shooting at Reynaldo and Lorenzo. Reynaldo fell to the ground, and Lorenzo took cover.

ORDER RE EXTRADITION
09-70576 DMR                                6

Ms. Velasquez Perez protected her daughter. Ms. Heredia pulled on Ms. Velasquez Perez and urged her to hide so that they would not be injured by Mr. Gonzales Gonzales, but Ms. Velasquez Perez was reluctant to leave because she saw that her husband had been injured. She went to her home, then came back later and learned that her husband had been transported to Uruapan for medical attention. Ms. Velasquez Perez stated that these events took place in broad daylight, approximately four meters away from her.

### d. The Statement of Maria Isabel Heredia Ramos

Ms. Heredia Ramos stated that she has known Reynaldo, Lorenzo, and Mr. Gonzales Gonzales because they have lived in the same town for many years. At approximately 8:30 a.m. on the date in question, she was returning from the kindergarten where she had just dropped off her son. She ran into Ms. Velasquez Perez and her daughter, who were on the way to the kindergarten. They stopped to greet each other. Ms. Heredia Ramos saw Reynaldo and Lorenzo coming up the street behind her. She saw Mr. Gonzales Gonzales outside his home. She heard Reynaldo ask him what the problem was and what he wanted. Mr. Gonzales Gonzales cursed at Reynaldo, then asked him to wait for him. He entered his home, brought out a rifle, and began shooting at Reynaldo and Lorenzo. She saw that Reynaldo had fallen to the ground. Ms. Heredia Ramos took cover and saw that Ms. Velasquez Perez was trying to protect her daughter, who began screaming. She pulled on Ms. Velasquez Perez and moved toward Ms. Velasquez Perez's home. Ms. Heredia Ramos stated that these events took place in broad daylight, approximately four meters from her.

### e. Other Supporting Evidence

The documents submitted in support of extradition also include a March 22, 2006 police report setting forth the substance of investigatory interviews of Lorenzo and Reynaldo, which are generally consistent with the information contained in Lorenzo and Reynaldo's sworn statements. (Hill Decl. Attach. 1 Ex. 10.) Medical records indicate that Reynaldo received medical treatment on March 6, 2006 in Uruapan for life-endangering wounds, which included multiple round wounds on the right inguinal region and round wounds on the right forearm. (Hill Decl. Attach. 1 Ex. 9.) On October 31, 2008, a court in Uruapan conducted an

identification hearing at which Reynaldo and Lorenzo each clearly identified Mr. Gonzales Gonzales as the accused person out of a six-person photographic line-up. (Hill Decl. Attach. 1 Ex. 12 at 1-2.)

In sum, the evidence supporting probable cause includes the sworn statements of four eyewitnesses, all of whom attest to the same basic facts. A contemporaneous medical record corroborates the injuries sustained by Reynaldo. There is no question of false identification of the accused, as Mr. Gonzales Gonzales' is well-known to all four witnesses, and his identity was confirmed again in 2008 in a court proceeding.[3] On this record, the court finds that the charge is supported by probable cause.

## IV. CONCLUSION

Pursuant to 18 U.S.C. § 3184, the undersigned certifies to the United States Secretary of State that Eustolio Gonzales Gonzales has been charged with the crime of attempted homicide by the United Mexican States, that the crime is an extraditable offense pursuant to the Treaty between the United States and Mexico, and that sufficient evidence has been presented to sustain the charge under the provisions of that treaty.

DATED: April 10, 2012



_____
DONNA M. RYU
United States Magistrate Judge

---

[3] At the hearing, Mr. Gonzales Gonzales requested permission to present contextual evidence of a pre-existing family dispute. The court denied his request as beyond the limited scope of evidence that may be offered by an individual facing extradition. It remains true in this case that "'[b]ecause of the limited function of an extradition proceeding and the limited participation permitted of the fugitive, the order of the court does not reflect a consideration of all the merits of the case.'" *In re Flores Ortiz,* 2011 WL 3441618, at *3 (citation omitted).